UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHAD BEACH, | ) | Case No. 3:06CV478 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD C. NUGENT |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| ERNIE L. MOORE, Warden, | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Respondent. | ) | |

This matter is before the Court on a petition filed pursuant to 28 U.S.C. § 2254 for a writ of federal habeas corpus filed by Chad Beach ("Petitioner").  ECF Dkt. #1.  For the following reasons, the undersigned recommends that this Court DISMISS the instant petition for writ of habeas corpus with prejudice.

I.      FACTUAL AND PROCEDURAL HISTORY

A.      State Court Proceedings

The Court of Appeals, Sixth Appellate District, Lucas County, Ohio, set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998):

> On September 13, 2001, [Petitioner] was indicted and charged with one count of aggravated murder, in violation of R.C. 2903.01(B), with the specification that he had a firearm on or about his person or under his control while committing the offense, and displayed, brandished, indicated his possession of or used said firearm to facilitate the offense. The indictment was filed following the death of Joshua Buck, whose body was discovered in a manhole in a wooded area behind Bowsher High School in Toledo, Ohio on December 26, 1999. Over approximately the next

-1-

month, [Petitioner] spoke to police officers investigating the case four times, each time making statements that increasingly showed his involvement in the events surrounding the murder. On January 18 and 24, 2000, [Petitioner] made statements to Sergeant Steve Forrester and Detective James Scott with his attorney Paul Accettola present. [Petitioner] was not under arrest and made the statements voluntarily. Thereafter, believing that [Petitioner] had not been entirely forthcoming in his statement to the officers, Accettola arranged the January 24 interview but asked Lucas County Assistant Prosecutor Weglian for assurances that [Petitioner] could have a deal. Weglian indicated that if [Petitioner] was truthful and passed a polygraph exam, then he would be in a position to recommend that [Petitioner] could plead guilty to a theft offense. That polygraph exam, which was administered on January 25, 2000, resulted in an "inconclusive with probable deception" reading. Thereafter, the state indicated that the most it would be willing to offer [Petitioner] in terms of a plea bargain was involuntary manslaughter.

On December 17, 2001, [Petitioner] filed a motion to enforce plea agreement and a motion to determine the inadmissibility of statements pursuant to Evid.R. 410. Regarding the alleged plea agreement, [Petitioner] sought to enforce an agreement to allow him to plead guilty to a theft offense. The lower court held a hearing and denied the motions, concluding that neither of the interviews of January 18 or 24 were induced by a plea agreement. Thereafter, the case proceeded to trial.

The circumstances surrounding Buck's death, the discovery of his body and the police investigation into his death were testified to at the trial below as follows.

[Buck's body was discovered in a manhole deep in the woods behind Bowsher High School]. Dr. Cynthia Beisser, a deputy coroner with Lucas County, testified that Buck died from a single gunshot wound to the back of the head and that the gun was approximately six to eight inches from Buck's head at the time of the assault....Given the outside temperatures, however, Dr. Beisser testified that she could not estimate the time of Buck's death.

An investigation revealed that [Petitioner], Buck and Scott McDonald were involved in drug trafficking. John Geach, a close friend of Buck, testified that during 1999, he hung out with Buck and they used drugs together on almost a daily basis. Geach stated that Buck sold 10 to 20 pounds of marijuana per week, about one-half of a kilogram of cocaine per month and that Buck obtained his drugs from [Petitioner]. Geach further stated that Buck had a lot of money which he kept in safes at Buck's father's house, Geach's apartment and Scott McDonald's house, and that Buck often kept drugs at Geach's apartment. Geach testified that on December 23, 1999, he and several other people including Buck were at his apartment when he became aware of a drug transaction that was to occur the next day. Geach's understanding of the transaction was that Buck was to buy 150 pounds of marijuana and one kilogram of cocaine from [Petitioner]. To his knowledge, no one else was to be involved in the transaction. At approximately 4:00 p.m. on Christmas Eve, Geach left his apartment to go to work. At that time, the transaction had not yet taken place and Buck remained in Geach's apartment. Geach got off of work at 8:00 p.m., and talked to Buck, who was on his way home. During the evening, Geach talked to

Buck approximately three times, and each time Buck indicated that the deal had not yet occurred. Geach last talked to Buck between 10:30 and 11:00 p.m. He awoke on Christmas Day at around 10:00 a.m., and spent the day with his fiancee and family. At around 6:30 that evening, Geach received a phone call from a friend of Buck who notified him that Buck's pager and driver's license had been found. Geach then went out looking for Buck. During his search, he went to what he believed was Scott McDonald's house, but [Petitioner] answered the door. Evidently, [Petitioner] rented the house from McDonald's parents. At that time, [Petitioner]'s wife Michelle and friend Chris Henneman were also at the house. Geach notified [Petitioner] that Buck was missing and asked him if the drug transaction had taken place. [Petitioner] responded that the transaction had not taken place and that he had not seen Buck. Geach testified that when he told [Petitioner] that Buck's pager and driver's license and been found and that blood was in the vicinity, [Petitioner] seemed concerned. The following day, Geach learned of Buck's death and went back to [Petitioner]'s home. At that time, [Petitioner] handed Geach $5,000, which he said was a deposit Buck had given him. Geach then took the money to Buck's father who was upset that there was not more money.

Detective James Scott of the Toledo Police Department, was involved in the investigation of Buck's death and testified at the trial below. On January 19, 2000, Scott learned through [Petitioner]'s attorney, Paul Accettola, that there was a lime green Michigan baseball cap in Cincinnati that might be of evidentiary value. He subsequently recovered the cap from [Petitioner]'s mother-in-law. Forensic testing on the hat ... revealed Buck's DNA. On January 19, 2000, officers of the Toledo Police Department also learned from [Petitioner], through Attorney Accettola, the location of Buck's Jeep. The officers recovered the automobile and discovered the interior splattered with a significant amount of blood.... The Jeep also contained a blood soaked black leather jacket and a Colt .38 caliber revolver. The gun contained four live rounds and two empty chambers. Subsequent ballistics tests revealed that the bullet recovered from Buck was consistent with having been fired from the Colt revolver recovered from the Jeep.

In the course of the investigation, [Petitioner] was interviewed several times. Initially, on December 27, 1999, Sergeant Steve Forrester and Detective Scott went to [Petitioner]'s home to interview him. [Petitioner]'s wife Michelle was also present. During that initial interview, [Petitioner] told the officers that he was in Cincinnati visiting his wife's family on December 24 and 25 and that the $5,000 that he gave to Geach was a loan from Buck. [Petitioner] then changed his story and said that he had been holding the money for Buck because Buck liked to spread his money around. Several days later, on January 3, 2000, Sergeant Forrester and Detective Scott again interviewed [Petitioner] after they asked him to voluntarily come to the station. Sergeant Forrester described that meeting as a noncustodial, nonconfrontational interview in which the officers were simply seeking more information about the critical time periods. During that interview, [Petitioner] changed his story and revealed that he was in Toledo on December 24, 1999, that he was in church until 6:00 p.m., that he went somewhere afterward, that he got home around 10:00 p.m.,

-3-

that he then went to Chris Henneman's house, that he stayed there until 1:30 a.m. on Christmas Day, and that he then returned home.

On January 18, 2000, Sergeant Forrester and Detective Scott interviewed [Petitioner] for a third time. Approximately one hour after Scott McDonald was arrested, [Petitioner] telephoned the officers and indicated he had information. At this interview, [Petitioner]'s attorney, Paul Accettola, was present. Again [Petitioner] changed his story. [Petitioner] revealed that in early December he and Buck entered into an agreement for Buck to buy approximately 100 pounds of marijuana from him. Buck was to put down $33,000 for the marijuana and would pay [Petitioner] the remainder due in two weeks. [Petitioner] was going to get the marijuana from his connection in Chicago. Right before Christmas, however, it was unclear if [Petitioner] would be able to get the marijuana. The two then agreed that Buck would give [Petitioner] $5,000 as a deposit to secure the marijuana if it came in. [Petitioner] told the officers that on December 23, 1999, Buck gave him $5,000 and kept the remaining $28,000. On Christmas Eve, however, [Petitioner] delivered to Brad Chester $13,000 in cash as his investment in a pizza franchise. [Petitioner] told the officers at the January 18 interview that he had already had that money and that he gave it to Chester on Christmas Eve, because Chester had told him he had found a location for the pizza franchise and needed to act on it. [Petitioner] further revealed in that interview his contact with Scott McDonald. [Petitioner] stated that McDonald was aware of the drug deal between [Petitioner] and Buck. He then stated that he only saw McDonald once on Christmas Eve at approximately 1:30 in the afternoon. He denied having any further contact with him on that day. Regarding his whereabouts on Christmas Eve, [Petitioner] indicated that he was either at church, or with family or friends until approximately 1:30 a.m. on Christmas morning when he returned home. Although [Petitioner] initially denied that McDonald was at his house at around 11:00 p.m. on Christmas Eve, he subsequently remembered that McDonald did stop by briefly. Then, when questioned about Buck's murder, [Petitioner] revealed that McDonald had done it. [Petitioner] stated that on December 26, 1999, he met McDonald at a Kroger store after Geach's visit. [Petitioner] stated that although McDonald did not come right out and admit to the killing, he did reveal that Buck's body was in a manhole and that he had dragged his body to the manhole. McDonald had also told [Petitioner] that he had burned the clothes that he, McDonald, had been wearing. Finally, [Petitioner] revealed to the officers that McDonald told him he shot Buck in the head in Buck's Jeep. He further stated, however, that he did not know the location of the Jeep.

The next day, Paul Accettola notified the officers that [Petitioner] did in fact know the location of the Jeep and it was then that the Jeep was recovered. The officers then met [Petitioner] at Accettola's office for a fourth interview. During that interview, [Petitioner] revealed McDonald's plan to set up Buck. Under the plan, [Petitioner] and Buck were to make a deal for Buck to buy 100 pounds of marijuana, Buck was to give [Petitioner] the bulk of the money and would later meet McDonald to pay the rest of the money and pick up the marijuana. McDonald, however, would not deliver the drugs. [Petitioner] then told the officers that on December 23, 1999,

-4-

Buck gave him $28,000. On Christmas Eve at about 1:30 in the afternoon, [Petitioner] then gave McDonald $23,000 and kept $5,000 for himself. Later that evening, McDonald returned to [Petitioner]'s home and indicated that Buck was pressing him to make the deal. [Petitioner] told the officers, however, that at that point, he was "out of the loop" and it was up to McDonald to deal with Buck. Later that evening, McDonald called [Petitioner] and said he was at a store and needed a ride. When [Petitioner] arrived to pick him up, McDonald had blood on his clothes. He then removed his clothes and put them in the trunk of [Petitioner]'s car. [Petitioner] drove McDonald home, McDonald went into his garage for clean clothes and put the bloodied clothes into garbage bags. When McDonald asked [Petitioner] to burn the clothes, [Petitioner] refused. McDonald then said he could burn them at Blair's dad's house. [Petitioner] then dropped McDonald off at his car and went to Chris Henneman's house. [Petitioner] told the officers that McDonald told him that Buck "started going crazy on him" and so McDonald shot him in the head. [Petitioner] further admitted, however, that he sold McDonald a Smith & Wesson revolver about three weeks before Christmas and that he got the gun from Henneman. Nevertheless, [Petitioner] insisted that he did not know McDonald was going to kill Buck. Regarding the $13,000 that he gave to Brad Chester on Christmas Eve, [Petitioner] told the officers that he had the money long before that night and that Chester needed it at that time because he had found a location for their pizza shop.

Brad Chester testified at the trial below that he owns Bambino's Pizza and that he and [Petitioner] work out together at the Power House Gym. Chester stated that in the fall of 1999, [Petitioner] indicated that he was interested in investing in a new pizza shop that Chester wanted to open. In early to mid December, 1999 Chester told [Petitioner] that he would need the money soon so that he could secure a location for the pizza shop. Then, on Christmas Eve, [Petitioner] left a message for Chester indicating that he had the money. Before New Years Eve, [Petitioner] brought Chester $13,000 in cash in small bills in a bag. Subsequently, the police contacted Chester and he eventually returned the money to [Petitioner].

In addition to the above, several friends and acquaintances of [Petitioner] and/or McDonald testified at the trial [including Sharay Vig Hardison and Steven Massey].

Christopher Henneman testified as to his recollection of the events surrounding the death of Joshua Buck. Henneman and Buck had been friends since the sixth grade and Henneman knew [Petitioner] and McDonald from the neighborhood. They all went to Bowsher High School. Although Henneman and Buck had been close friends, Henneman stated that in 1997, they had a falling out over money. Henneman then began to hang out with [Petitioner]. They all used drugs and [Petitioner] sold drugs with Henneman working as a runner. Henneman stated that [Petitioner] usually got his drugs from a guy named "Sosh" or "Stosh" and that [Petitioner] was deeply in debt. Shortly before Christmas 1999, Henneman was at [Petitioner]'s house when [Petitioner] and his wife were laughing about something. [Petitioner] then told Henneman that McDonald had burned his face and he had no

eyebrows, but [Petitioner] would not tell Henneman how McDonald burned his face. Finally, later that evening, [Petitioner] told Henneman that McDonald was looking down a hole and a back draft came up and hit him, burning his face. When Henneman asked why McDonald was looking down a hole, [Petitioner] told him that if you preburn a hole before putting a body in it, dogs can't smell the body. Henneman testified that he believed that conversation took place on December 22, 1999. Henneman then stated that on Christmas Eve he went to [Petitioner]'s house at around 10:45 p.m. After a short time, [Petitioner] suggested that they go to Henneman's house to smoke marijuana, which they did. [Petitioner], however, only stayed at Henneman's house for about ten minutes, and he left at around 11:15 p.m., saying he had to pick up some money. [Petitioner] returned to Henneman's house at around 1:00 a.m. Henneman testified that when [Petitioner] came in, he "stared at me weird" and then suggested they smoke marijuana. [Petitioner] left shortly thereafter. Henneman stated that when he returned at 1:00, [Petitioner] was wearing the same clothes that he wore earlier and that the clothes did not appear bloodied or damaged. Subsequently, after Buck's body was discovered, [Petitioner] sat his wife Michelle and Henneman down, said the police were asking him questions, and said he wanted to make sure their stories were the same. He asked Henneman to tell the police that they were together the whole evening. Henneman also testified that several days before Christmas, he gave [Petitioner] a Smith & Wesson gun. Thereafter, Henneman lied to the police and stated that he and [Petitioner] were together the whole evening. Explaining his reason for lying, Henneman testified that he was afraid because [Petitioner] once told him that friends who were disloyal end up in holes like Josh. Toward the end of January 2000, Henneman left town and went to New Mexico. Eventually, however, he called the police and told them the truth.

Finally, Leo Martinez, Buck's neighbor, also testified at the trial below. Martinez recalled that on Christmas Eve 1999, at approximately 11:55 p.m., he was letting his dog out when he noticed Buck's car driving away. Martinez testified that although he could not see exactly who was in the car, he could tell that there were three people in the car, two in the front seat and one in the back, and that Buck appeared to be sitting in the front passenger's seat leaning over as if to pick up something. The driver of the car appeared to be larger that Buck.

In his defense, [Petitioner] called his wife Michelle Beach and prior attorney Paul Accettola as witnesses. Michelle testified that in December 1999, [Petitioner] supported them by selling drugs. Michelle recalled the events of Christmas Eve and Christmas Day 1999 and, although her time line varied a bit from other witnesses, she admitted on cross-examination that she did not know where [Petitioner] was from 12:30 a.m. to 1:30 a.m. Christmas morning. Accettola testified that after discussions with [Petitioner], he relayed to the police the general location of Buck's Jeep. Accettola further testified regarding his attempts to verify that a telephone call was made to [Petitioner]'s home late on December 24 or early on December 25 from any of a number of pay phones in the general area from which [Petitioner] believed McDonald had called him for a ride. Accettola stated that he collected the numbers and presented them to the Mr. Weglian of the prosecutor's office along with a copy

-6-

of a court order which Ameritech required to access the information. Accettola testified that when he submitted the information to Weglian, he told Weglian of the time frame within which the order had to be signed and submitted to Ameritech before the information was lost but that Weglian subsequently informed him that the court order had not been timely transmitted.

At the conclusion of the trial, the jury returned a verdict of guilty on the charge of aggravated murder in violation of R.C. 2903.01(B). The jury, however, was unable to reach a verdict on the firearm specification. [Petitioner] was subsequently sentenced to life in prison with parole eligibility after 20 years.

ECF Dkt. #10, Attachment 5; *See also* ECF Dkt. #10, Attachment 2.

Prior to trial, on December 17, 2001, Petitioner filed a motion to enforce a plea agreement. ECF Dkt. #10, Attachment 2 at 14. The State filed a response and the trial court held a hearing and subsequently denied the motion. *See* ECF Dkt. #10, Attachment 2 at 14-15. (Tr. Motion hrg, pp. 1-220). Also, at the close of the State's case, Petitioner moved for a Rule 29 motion for acquittal which was denied. *See* ECF Dkt. #10, Attachment 2. (Tr. Vol. V, pp. 838 - 839).

Petitioner, represented by different counsel than in the trial court, timely appealed his conviction, raising the following nine (9) assignments of error:

1.      The trial court erred to the prejudice of [Petitioner] by denying his motion to exclude statements of the defendant made in the course of negotiating a plea agreements in violation of Evid. R. 410 and in violation of his Due Process rights guaranteed under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

2.      Assuming, arguendo, that the statements of [Petitioner] to law enforcement officers were not within the purview of Evid. R. 410, counsel was ineffective in not ensuring that the rules' protections were afforded to [Petitioner], in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.

3.      The trial court erred and denied [Petitioner] Due Process of Law by permitting the state to argue at trial that he was a complicitor after previously taking the position that he was the principal offender, in

-7-

violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the [U.S.] Constitution and the applicable portions of the Ohio Constitution.

4.      The trial court improperly amended the indictment by permitting the state to argue that [Petitioner] acted as a complicitor in violation of his Due Process rights guaranteed under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

5.      The inconsistent verdicts violated [Petitioner's] rights to Due Process and to be free from cruel and unusual punishment as protected by the constitutions of the United States and of the State of Ohio.

6.      Insofar as any of the errors complained of herein are deemed not to have been preserved properly by trial counsel, [Petitioner] was denied the effective assistance of counsel to which he is constitutionally entitled.

7.      Prosecutorial misconduct during the closing argument of the state deprived [Petitioner] of his right to a fair trial and reliable adjudication and the trial court erred in denying the defense motion for a mistrial in violation of his Due Process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.

8.      The trial court erred to the prejudice of [Petitioner] by denying the motion for acquittal presented by the defense at the conclusion of the presentation of evidence.

9.      Even if the assigned errors viewed individually are determined to be harmless, their cumulative effect can be prejudicial.

ECF Dkt. #10, Attachment 3.  The State filed a brief in response.  ECF Dkt. #10, Attachment 4.

Petitioner then filed a reply brief.  ECF Dkt. #10, Attachment 4.  On September 30, 2004, the

Court of Appeals affirmed the judgment of the trial court.  ECF Dkt. #10, Attachment 5.

On November 10, 2004, Petitioner, through appellate counsel, filed a timely discretionary

appeal to the Ohio Supreme Court, setting forth the following three (3) propositions of law:

I.      Statements made by a criminal defendant to law enforcement officers at the direction of the defendant's criminal defense attorney and in consultation with a prosecutor in the context of plea negotiations are

-8-

privileged under Evid. R. 410.

II.      A criminal defendant's due process rights under the Fifth, Sixth, and
         Fourteenth Amendments to the United States Constitution and the
         applicable portions of the Ohio Constitution are violated when a jury
         returns verdicts that are inconsistent with the evidence presented at trial.

III.     A criminal defendant's due process rights and notice under the Fifth, Sixth
         and Fourteenth Amendments to the United States Constitution and the
         applicable portions of the Ohio Constitution are violated when the State
         alters its theory of the case after representing during the pre trial stage that
         an alterative (sic) theory would be pursued.

ECF Dkt. #10, Attachment 6-7.  The State did not file a memorandum in response.  On March 2,

2005, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving

any substantial constitutional question.  ECF Dkt. #10, Attachment 8.

### B.      Federal Habeas Petition

On March 02, 2006, Petitioner filed the instant petition for writ of habeas corpus

setting forth the following three (3) grounds for relief:

(A)      Ground one: Petitioner's statements to Police were involuntarily made and
         as such their admission during trial violated Due Process.

(B)      Ground two: Prosecutions constructive amendment of the charges during
         trial violated Due Process.

(C)      Ground three: As [sic] jury's verdict returning of inconsistent verdict's
         [sic] violated Due Process.

ECF Dkt. #1.  On March 14, 2006, this case was referred to the undersigned for a report and

recommendation.  ECF Dkt. #6.  On June 8, 2006, Respondent Warden Ernie Moore

("Respondent") filed an Answer along with the state court transcripts.  ECF Dkt. #10.  On July

19, 2006, Petitioner filed a Reply.  ECF Dkt. #12.

## II.      STANDARD OF REVIEW

Since Petitioner filed his habeas petition after April 24, 1996, the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), standards apply.  *See*

*Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under

Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the

United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

### A.      Procedural Barriers to Review

Before a court will review the merits of a federal petition for a writ of habeas corpus, a

petitioner must overcome several procedural hurdles.  Namely, a habeas petitioner must

surmount the barriers of time limitation,[1] exhaustion and procedural default.

As a general rule, a state prisoner must exhaust all possible state remedies or have no

remaining state remedies before a federal court will review a petition for a writ of habeas corpus.

28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27 (2004). To exhaust a claim,

a petitioner must present it "to the state courts under the same theory in which it is later

presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also*

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).   The exhaustion requirement is

satisfied  "once the federal claim has been fairly presented to the state courts."  *Franklin v. Rose*,

811 F.2d 322, 325 (6th Cir. 1987).

In order to have fairly presented the substance of each of his federal constitutional claims

to the state courts, the petitioner must have given the highest court in the state in which he was

---

[1] The instant petition has been timely filed as acknowledged by Respondent in this case. ECF Dkt. #10 at 15.  Therefore, the barrier of time limitation is not an issue in this case.

convicted a full and fair opportunity to rule on his claims. *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A petitioner fairly presents the substance of his federal constitutional claim to the state courts by (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.) cert. denied, 509 U.S. 907 (1993) (quotation omitted).

Unless an exception applies, a petition must be dismissed for lack of exhaustion if it contains at least one issue which was not presented to the state courts so long as a remedy is still available for the petitioner to pursue in the state courts. *Rose v. Lundy*, 455 U.S. 509, 518-20 (1982). The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist." *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds*, *Fay v. Noia*, 372 U.S. 391 (1963). A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address because of the petitioner's noncompliance with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Simpson v. Jones*, 238 F.3d 399, 406

(6th Cir. 2000). If a defendant fails to present his federal claims to the state court in the manner required by a long-standing state procedural rule and the final state court addressing the claim holds that further consideration of the claim is precluded because of a defendant's procedural default, then a district court cannot consider the merits of the claim absent a showing of cause for the state procedural default and prejudice resulting from the constitutional error asserted by the claim. *Wainwright*, 433 U.S. at 86-87. In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). A court can raise the doctrine of procedural default *sua sponte*. *See Elzy v. United States,* 205 F.3d 882 (6th Cir. 2000).

A claim that is procedurally defaulted in state court will not be reviewed by a federal habeas court unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *See Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *See Smith v. Murray*, 477 U.S. 527 (1986).

**B.      Standard of Review for the Merits of a Claim**

When a habeas petitioner overcomes the aforementioned procedural obstacles, the AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

Under the "contrary to" clause, federal courts may only grant the petitioner's writ if the state court's decision contradicts Supreme Court precedent on a question of law or if, in a case with facts materially indistinguishable from a Supreme Court case previously decided, the state court reaches an outcome different from that required by the Supreme Court's decision. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" clause permits a federal court to grant habeas relief only if the state court applies a correct legal principle to the facts of the case in an objectively unreasonable manner. *Id.* at 411. The Supreme Court has cautioned that a "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.; see also Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

### III.   ANALYSIS

Petitioner presents three grounds for relief all of which allege Due Process violations that occurred when his statements to the police were involuntarily made, the prosecution constructively amended the charges at trial and the jury's verdict was inconsistent. ECF Dkt. #1. The undersigned will address each argument in turn.

-13-

### A.      Ground for Relief One

In this first Ground for Relief Petitioner argues that his statements to police on January 19 and 24 were involuntary because they were based on an illusory promise, and in the alternative he argues ineffective assistance of trial counsel for failure to properly ensure that protections were in place to exclude the statements from trial, and finally, that if his claims are defaulted that it is due to the ineffective assistance of appellate counsel. ECF Dkt. #1, Attachment 1 at 3-9; ECF Dkt. #12 at 3. Respondent argues that the claim that his statements to police were involuntary was not fairly presented to the state courts and the claim of ineffective assistance of trial counsel is without merit. ECF Dkt. #10.

As to the claim of involuntariness, a petitioner fairly presents the substance of his federal constitutional claim to the state courts by (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.) cert. denied, 509 U.S. 907 (1993) (quotation omitted). The exhaustion requirement is not satisfied until "the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

Before the state trial court, Petitioner argued before trial that his statements to the police on January 19 and 24 with his attorney present should be excluded pursuant to Ohio Rule of

-14-

Evidence 410.  That rule provides that "any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty[,]" is inadmissible at trial.  Ohio R. Evid. 410.  Petitioner made the same argument on appeal in front of the Sixth District Court of Appeals and the Ohio Supreme Court.  *See* ECF Dkt. #10, Attachment 3-4; Attachment 6-7.  Petitioner argued under the test enunciated in *State v. Frazier*, 73 Ohio St.3d 323, 337 (1995) (borrowing from federal law for the parallel federal evidence rule), that he had a subjective expectation that a plea was being negotiated when he made statements to police on January 19 and 24 and those expectations were reasonable under the circumstances.  ECF Dkt. #10, Attachment 3 at 17-21.

Now in federal court, Petitioner argues that his statements to police on January 19 and 24 were involuntary because of an "improper, illusory promise started as a result of a contact between the Petitioner's counsel, ... and the assistant prosecutor for Lucas County, Ohio[.]"  Petitioner argues that the cases of *United States v. Johnson*, 351 F.3d 254 (6th Cir. 2003), *Williams v. Withrow*, 944 F.2d 406 (6th Cir. 1992) and *United States v. Cross*, 1992 U.S. App. LEXIS 4719 (6th Cir. 1992) are analogous to his case.  *See* ECF Dkt. #1, Attachment 1.  While both of Petitioner's arguments in the state court and here reference Due Process and federal case law, it is clear that Petitioner framed his legal argument differently in the state courts.  For instance, the state courts' legal analysis involved a discussion of Petitioner's subjective expectation that a plea negotiation was taking place and the objective circumstances surrounding the alleged negotiation.  *See Frazier, supra*.  But here, in order to analyze Petitioner's claim, the Court must look at the nature of the alleged promise made by the assistant prosecutor and what, if any, was its effect on Petitioner's will to speak with police.  *See Finley v. Rogers*, 116 Fed.

-15-

Appx. 630, 635 (6th Cir. 2004); *Williams, supra*.  Case law clearly requires that a petitioner present his federal claims "to the state courts under the same theory in which [they are] later presented in federal court."  *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  The new argument Petitioner presents in federal court changes the focus of the inquiry from Petitioner to the prosecuting attorney.  Accordingly, the undersigned finds that this claim has not been fairly presented to the state courts and in fact, was never presented in the state courts in its present form.

"Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them. If a habeas petitioner sought to return to state court and attempt to present new claims to the Ohio Supreme Court, that court would find them procedurally barred."  *Dickerson v. Mitchell,* 336 F.Supp. 2d 770, 786 (N.D. Ohio 2004).  Moreover, "[t]he Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals."  *Fornash v. Marshall*, 686 F.2d 1179, 1185 n. 7 (6th Cir.1982) (citing *State v. Phillips*, 272 N.E.2d 347, 352 (Ohio 1971)).  When a petitioner fails to present a claim in state court, this Court may procedurally default that claim because the Ohio state courts would no longer entertain the claim.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).  In order for a federal habeas corpus petitioner to obtain a merits review of the procedurally defaulted claim by this Court, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or show that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)); *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).

-16-

Petitioner has the burden of showing cause and prejudice to overcome a procedural default. *Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir. 1999).

In this case, since Petitioner has not presented the instant claim to the state courts, it has been procedurally defaulted. However, Petitioner argues that any procedural default is due to the ineffective assistance of appellate counsel for failing to raise this ground for relief in the state courts. ECF Dkt. #1, Attachment 1; ECF Dkt. #12.

Ineffective assistance of appellate counsel, if it rises to the level of a federal constitutional violation, can serve as cause to excuse the procedural default of claims brought in a habeas corpus proceeding. *Buell v. Mitchell*, 274 F.3d 337, 351-52 (6th Cir. 2001) ("[The petitioner's] ineffective assistance of appellate counsel claims can serve as cause for the procedural default of his other claims only if [the petitioner] can demonstrate that his appellate counsel was constitutionally ineffective. To do so, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense."). However, if petitioner's ineffective assistance of appellate counsel claim lacks merit, it cannot constitute cause to excuse his default. *See Munson v. Kapture*, 384 F.3d 310 (6th Cir. 2004). Thus, the undersigned must first determine whether Petitioner's ineffective assistance of appellate counsel claim has merit, before considering whether, this ineffective assistance claim can cure the default of the claim contained in his first ground for relief.

Here, as above, Petitioner's claim fails for the same reason; namely, he failed to raise this claim in the state courts. To reiterate, "Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted .... If a habeas petitioner sought to return to state court and attempt to present new claims to the Ohio Supreme Court, that

-17-

court would find them procedurally barred." *Dickerson v. Mitchell,* 336 F.Supp. 2d 770, 786 (N.D. Ohio 2004); *see also Fornash v. Marshall,* 686 F.2d 1179, 1185 n. 7 (6th Cir.1982) (explaining that the Ohio Supreme Court will not entertain claims not preserved in the Ohio Court of Appeals).  Accordingly, this claim of ineffective assistance of appellate counsel is procedurally defaulted in this Court and thus, cannot cure the default of Petitioner's claim of involuntary statements.  *See Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

As to Petitioner's claim of ineffective assistance of trial counsel, he argues that his pretrial counsel failed to ensure that the protections of Evid. R. 410 were in place before Petitioner spoke with police.  *See* ECF Dkt. #10, Attachment 3 at 21-22.  He raised this claim in the state courts and the state court of appeals ruled that Petitioner did receive effective assistance.  *See* ECF Dkt. #10, Attachment 5 at 19-21.

A claim for ineffective assistance of trial counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  The *Strickland* standard requires a defendant to show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant.  *Id*. at 688, 694.  A court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.  Debatable trial tactics do not constitute ineffective assistance of counsel, but rather, a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  *Id.*

Since a claim of ineffective assistance of counsel presents a mixed question of fact and law, the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1) applies.  *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 2004 U.S. LEXIS 896 (Jan. 26, 2004).  Thus, to succeed on an ineffective assistance of counsel claim, Petitioner must demonstrate that the state courts applied the *Strickland* standard in an objectively *unreasonable* manner, which is more than just erroneously or incorrectly.  *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (emphasis added); *see also Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

The state appeals court examined the testimony of trial counsel from the hearing on the motion to determine the admissibility of Petitioner's statements at trial.  The court determined that trial "counsel's goal was to remove the cloud of suspicion from [Petitioner] by having [him] speak honestly with the officers."  ECF Dkt. #10, Attachment 5 at 21; *see* ECF Dkt. #10, Attachment 11 ("Hearing Transcript") at 3-11.

Indeed, at the hearing, trial counsel explained that he felt that Petitioner was the inappropriate target of the police investigation of the underlying crime and that one of the benefits to cooperating with the police would be to remove him as a target.  *Hearing Transcript* at 7.  Trial counsel explained that after the January 18 interview, he "arranged a fourth interview for January 24 in the hopes that [Petitioner's] additional statement would prevent the state from indicting him on murder charges."  *Id.*; *see also Hearing Transcript* at 60.  Thus, it is clear that when Petitioner spoke with police on January 19 and 24, no charges had been filed against him, but rather his attorney was making an attempt to clear him of suspicion.  Thus, it is unreasonable to conclude that "trial counsel was ineffective by failing to require [Petitioner] to offer to plead guilty to some offense in exchange for his statement."  ECF Dkt. #10, Attachment 5 at 20.

-19-

Further, the statements made by Petitioner inculpated a third party, one Scott McDonald. *See* ECF Dkt. #10, Attachment 5 at 9-11.  It is not ineffective assistance of counsel to attempt to clear one's client from suspicion only to find out that the same client was not being entirely truthful with his attorney or investigators.  *See, e.g.,* ECF Dkt. #10, Attachment 10 at 9, 56-58. In fact, the prosecuting attorney admitted that if the facts were as trial counsel had believed them to be, before Petitioner's lies were uncovered, that Petitioner would have been looking at a relatively minor charge.  ECF Dkt. #10, Attachment 10 at 52.  However, this is a far cry from an illusory promise, as Petitioner argues, or a plea deal.

If Petitioner did not see fit to aid his attorney by telling him the truth and allowing his attorney to determine the strategy from that vantage point, he can hardly complain of ineffective assistance of counsel when his story backfired.  The state appellate court concluded that trial counsel's actions with respect to the January 19 and 24th interviews fell within the realm of reasonable representation and based on the foregoing, the undersigned cannot conclude that the state court applied *Strickland* in an objectively unreasonable manner.

Therefore, the undersigned recommends that the Court find that the claims of involuntary statements and ineffective assistance of appellate counsel for failing to raise the claim of involuntariness in Ground for Relief One to be procedurally defaulted and find the claim of ineffective assistance of trial counsel to be without merit.

### B.     Ground for Relief Two

Petitioner alleges that the state violated his Sixth Amendment right to fair notice of the charges against him when the bill of particulars indicated that the prosecution was proceeding against Petitioner as the principal in the offense, but then revealed during voir dire that the

prosecution was proceeding under a theory of complicity.  ECF Dkt. #1, Attachment 1 at 10.

Ohio Revised Code 2923.03 allows for a charge of complicity to be stated by itself or in terms of the principal offense.  O.R.C. § 2923.03 (F).  The case law firmly supports this practice.  *See, e.g., State v. Keenan*, 81 Ohio St.3d 133, 151 (1998).  Therefore, Petitioner could have and should have had notice that the state had the option to include a theory of complicity by virtue of O.R.C. 2923.03 and the well established state case law.  *See State v. Hand*, 107 Ohio St. 3d 378, 404 (Ohio 2006).

Moreover, in order for Petitioner to present a colorable claim that an impermissible variance occurred, he must prove that his defense was prejudiced.  *See Berger v. United States*, 295 U.S. 78, 82-83 (1935); *United States v. Hart*, 70 F.3d 854 (6th Cir. 1995); *Hand*, 107 Ohio St.3d at 404.  A variance occurs when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.  *Martin v. Kassulke*, 970 F.2d 1539, 1542 (1992) (citing *United Stated v. Ford*, 872 F.2d 1231, 1235 (1989)).  However, a variance is only material if it misleads the defendant at trial.  *Id.; see also United States v. Nathan*, 816 F.2d 230, 235 (6th Cir. 1987); *United States v. Enright*, 579 F.2d 980, 988 (6th Cir. 1978); *Stone*, 416 F.2d at 864.

In this case, Petitioner fails to point out how he would have defended himself differently had he known expressly from the bill of particulars that the state was going to proceed on a theory of complicity.[2]  From the beginning of the trial, the defense theory was that Scott

---

[2] Petitioner also fails to explain how the evidence offered at trial proves facts materially different from the allegations in the indictment.  Rather, in Ohio, purpose to kill is an essential element of the crime of aggravated murder for both the principal offender and an aider and abettor. *State v. Scott*, 61 Ohio St.2d 155, 166 (1980).  Thus, under Ohio law, a defendant's purpose to kill must be proved as an essential element of the crime of aggravated murder even

-21-

McDonald and Petitioner conspired to steal money from the victim, but that McDonald killed the victim and Petitioner was not involved in that action at all.  ECF Dkt. #10, Attachment 17 at 19-23 (*Defense Opening Statement*).  Indeed, Petitioner told police a similar story when he first came under investigation.  *See Section A supra*.  The defense theory at trial would not have changed regardless of whether the state proceeded under a theory of principal or complicity to murder.

The Sixth Circuit opinions addressing this issue have expressly found no Due Process violation relating to notice where the defendant is indicted as a principal and the jury is subsequently charged with a complicity instruction.  *See Stone v. Wingo*, 416 F.2d 857 (6th Cir. 1969); *Hill v. Perini*, 788 F.2d 406, 407 (6th Cir. 1986); *Anderson v. Coyle*, 1999 U.S. App. LEXIS 1499, *5-6 (6th Cir. 1999).  The undersigned can find no reason to distinguish the instant case.  The lack of notice complained of in the instant case is meritless in light of the notice given by virtue of O.R.C. 2923.03 and the well established case law.

Based on the foregoing, the undersigned cannot conclude that the state court's decision was contrary to clearly established federal law.  Accordingly, the undersigned recommends that the Court find that this second Ground for Relief is without merit.

## C.     Ground for Relief Three

Lastly, Petitioner argues that the jury's returning of inconsistent verdicts violates Due Process.  ECF Dkt. #1.  Specifically, Petitioner argues that since the victim was killed by a gunshot wound to the head, it is illogical for the jury to find him guilty of aggravated murder but

where the prosecution proceeds on an aider and abetter theory. *Clark v. Jago*, 676 F.2d 1099, 1104 (6th Cir. 1982).

not guilty of the firearm specification. *Id.*

The Supreme Court has held that inconsistency in a verdict is not a sufficient reason for setting it aside. *See Dunn v. United States*, 284 U.S. 390 (1932); *United States v. Dotterweich*, 320 U.S. 277, 279 (1943); *Harris v. Rivera*, 454 U.S. 339 (1981). Indeed, the Supreme Court has rejected the rationale of Petitioner's argument in *United States v. Powell*, 469 U.S. 57 (1984), wherein a jury found Powell guilty of using a telephone in conspiring to possess with the intent to distribute cocaine and acquitted her of conspiring to possess with intent to distribute cocaine. *Id.* at 59-60. The court explained that an inconsistent verdict suggests that the jury did not speak its real conclusions, but that does not also mean that the jury was unconvinced of the defendant's guilt. *Id.* at 64-65. The portion of the verdict favorable to the defendant need not be accepted and the portion favorable to the prosecution be discarded. *Id.* at 65; *see also State v. Davis*, 2002-Ohio-3046, ¶ 24 (explaining that a conviction on the principal charge coupled with an acquittal on the specifications does not invalidate the principal conviction).

In this case, the jury found Petitioner guilty of aggravated murder and acquitted him of the firearm specification. The parties must accepted the jury's collective judgment after the jury has heard the evidence and the case has been submitted. *Powell*, 469 U.S. at 67. Inconsistent verdicts are to be viewed separately and that "no conclusion may be drawn from comparing the two." *Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999); *United States v. Miller*, 161 F.3d 977, 985 (6th Cir. 1998) (explaining that the jury is free to render inconsistent verdicts).

On appeal, the state court rejected Petitioner's argument that the jury's determination that he committed aggravated murder but inability to reach a decision on the firearm specification violated his rights under the Due Process clause. *See* ECF Dkt. #10, Attachment 5. The state

court relied on *State v. Davis*, 2002-Ohio-3046 (Ohio 2002) and explained that under Ohio law a conviction on the principal charge coupled with an acquittal on the specifications does not invalidate the principal conviction.  *Id.; See State v. Davis*, 2002-Ohio-3046, ¶ 24 (Ohio 2002). Accordingly, the undersigned cannot conclude that the state court adjudication of this claim resulted in a decision that was contrary to clearly established federal law.

Based on the foregoing, the undersigned recommends that the Court find Petitioner's Third Ground for Relief to be without merit.

## IV.      CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court DISMISS Petitioner's instant petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 with prejudice.  ECF Dkt. #1.


Date: April 30, 2007                              */s/George J. Limbert*
                                                  George J. Limbert
                                                  United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).